**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

RONNIE KEYES,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendants.

---

## COMPLAINT

---

      Plaintiff, Ronnie Keyes, by and through his attorneys, David Lane and Liana Orshan of

KILLMER, LANE & NEWMAN, LLP, hereby brings this Complaint and alleges as follows:

### I.      INTRODUCTION

      1.      Ronnie Keyes is dying. An infection that he contracted while a federal pre-trial

detainee at the Aurora Detention Facility, which is operated and managed by a private

corporation, The GEO Group, Inc. ("GEO"), under a contract with the federal government, is

killing him, and the doctors have told him that there likely is nothing more that they can do for

him.

      2.      Despite Mr. Keyes's paraplegia and known special medical needs, the United

States Marshals Service ("USMS"), which has custody over all federal pre-trial detainees, made

the decision to house Mr. Keyes at GEO's Aurora Detention Facility ("ADF")—a facility with

one doctor for 600 detainees—while Mr. Keyes was awaiting trial. For months, Mr. Keyes, his

family, and his criminal defense team complained to individuals employed by the USMS about

the lack of adequate medical care at ADF and his deteriorating health, but his complaints were

essentially ignored, with the USMS just taking the facility's doctor's word that all of Mr. Keyes's complaints were lies and a ploy to get out of detention.

3.       When his condition had deteriorated to such an extent that GEO had no choice but to take him to a hospital, the doctors at the hospital were forced to amputate his leg to try to save his life. However, other than through an extreme amputation, the doctors could not entirely treat an infection that had developed in Mr. Keyes's pelvic bone.

4.       Since the amputation, Mr. Keyes has been in and out of the hospital while the doctors try to get the infection under control, and he has had multiple surgeries, including additional amputations. However, doctors have informed him that there is almost no way to cure the infection at this point, and he is not likely to live for much longer.

5.       Because of the unreasonable, negligent, and reckless acts and omissions of individuals employed by the USMS, Mr. Keyes has had to endure and is continuing to endure unconscionable pain and suffering, and he likely also faces impending death.

## II.       PARTIES

6.       Plaintiff Ronnie Keyes is a citizen of the United States and was at all times relevant to the subject matter of this Complaint a resident of, and domiciled in, the State of Colorado.

7.       Under a contract with the federal government, The GEO Group, Inc, a private corporation, houses federal pre-trial detainees at the Aurora Detention Facility, a detention facility it owns, operates, and manages located at 3130 North Oakland Street, Aurora, Colorado 80010.

8.       The United States Marshals Service is a federal law enforcement agency within the Department of Justice. The USMS has custody over all federal pre-trial detainees. The USMS

made the decision to house Mr. Keyes at GEO's Aurora Detention Facility while Mr. Keyes was awaiting trial. During that time, the USMS retained custody over Mr. Keyes and had the authority to transfer Mr. Keyes elsewhere if Mr. Keyes's medical needs were being not being met at the Aurora Detention Facility.

9. At all times relevant to the subject matter of this Complaint, Deputy U.S. Marshal Gillian Fleck ("USMS Fleck") was a Deputy in Charge employed by the USMS and was acting within the scope of her office or employment. At all relevant times, USMS Fleck was responsible, among other U.S. Marshals, for evaluating whether Mr. Keyes's needs were being met at ADF.

10. At all times relevant to the subject matter of this Complaint, Deputy U.S. Marshal Michael Thomas ("USMS Thomas") was a Deputy employed by the USMS and was acting within the scope of his office or employment. At all relevant times, USMS Thomas was responsible, among other U.S. Marshals, for evaluating whether Mr. Keyes's needs were being met at ADF.

11. At all relevant times, USMS Fleck and USMS Thomas and all other USMS officers described herein ("USMS Employees") were acting within the scope of their employment or office with the USMS and, as such, Defendant United States of America ("United States") is the proper Defendant under the Federal Tort Claims Act.

12. Defendant United States is liable for the negligent or wrongful acts or omissions of USMS Fleck, USMS Thomas, and all other USMS Employees whose negligent or wrongful acts or omissions done within the scope of their office or employment caused or contributed to Plaintiff's injury.

13. This action is brought based on USMS Employees' own actions and omissions.

### III.    JURISDICTION AND VENUE

14.    This action arises under the laws of the United States, and is brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*

15.    Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1346(b).

16.    Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by the Equal Access to Justice Act, 28 U.S.C. § 2412, and 42 U.S.C. § 1988.

17.    Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1402(b). All of the acts and omissions alleged herein occurred within the State of Colorado, and Plaintiff was a resident of the District of Colorado at the time of the events giving rise to this Complaint.

18.    The administrative prerequisites to bring this action under 28 U.S.C. § 2675 and 28 U.S.C. § 2401(b) have been satisfied. Plaintiff presented his FTCA claim and supporting materials to the USMS on September 20, 2017 (and re-submitted the claim on October 10, 2017, in response to a request for resubmission in a different format from the USMS). The USMS denied Plaintiff's claim via letter from General Counsel Gerald M. Auerbach, subject "Administrative Tort Claim No. 0GC51191," dated December 13, 2017.

### IV.    STATEMENT OF FACTS

***GEO severely neglected Mr. Keyes's medical needs, with dire consequences for Mr. Keyes's health.***

19.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth therein.

20.    In 2006, Mr. Keyes was in a severe car accident, which caused him to become paralyzed. As a result, Mr. Keyes cannot walk, and he uses a wheelchair for mobility.

21.    In June 2016, Mr. Keyes was charged with a federal crime. Pending trial, he was placed by USMS Employees at ADF for pre-trial detention. ADF is operated and managed by

4

GEO under a contract with the USMS. The contract provides that ADF "will provide…all necessary personnel, equipment, materials, supplies, and services for the management of comprehensive detention services, which include…medical services…. These comprehensive detention services shall provide for the **safe, secure, and *humane* confinement**" of federal pre-trial detainees. (Emphasis added).

22.     Because of Mr. Keyes's condition, he has certain health complications and specific medical needs. However, before his detention at ADF, Mr. Keyes was doing well and was relatively healthy. When he arrived at ADF, he informed numerous GEO employees, agents, and contractors of what he required to stay healthy.

23.     Due to his paralysis and limited mobility, Mr. Keyes is prone to developing pressure ulcers (also called bedsores, pressure sores, or pressure injuries). To minimize the risk of pressure ulcers, Mr. Keyes sleeps on a special support surface, which puts less pressure on his skin than other mattresses.

24.     Mr. Keyes repeatedly requested an air mattress, which is a type of reduced pressure mattress, from GEO—and he and his family members and criminal defense team expressed concerns to the USMS Employees that he did not have an air mattress at the GEO facility—but he was never provided with one. As a result, he began to develop pressure sores, and the pressure sores he had when he arrived got worse.

25.     When Mr. Keyes began his detention, he only had two pressure ulcers, both of which were superficial. Mr. Keyes and those acting on his behalf requested permission from GEO and USMS Employees to bring into ADF the wound care supplies to treat the ulcers, but his family was never given permission to bring him the supplies he needed, despite Mr. Keyes's and his attorney team's stated concerns that the medical unit at the facility was not equipped to

treat the ulcers. He, his attorney team, and his family also asked if his personal wound care nurse could come to the facility to treat the pressure ulcers, but he was told that she could not.

26.    It soon became apparent to Mr. Keyes that GEO's medical treatment was woefully inadequate.

27.    From Mr. Keyes's arrival at ADF in June to when he was taken to the hospital in September, he filed numerous written complaints or grievances regarding his medical treatment. Not one was taken seriously. All such complaints and grievances were kept in a file that the USMS Employees could have accessed at any time.

28.    For instance, in early July, Mr. Keyes filed several grievance and medical complaint forms stating that his pressure ulcers were getting worse and there was a new one on his back, raising concerns about the procedures used by ADF medical staff to treat the ulcers, which he referred to as wounds, and listing the medical supplies he needed to treat wounds. ADF Health Services Administrator Scott Vineyard responded that his concerns had already been "adequately addressed."

29.    Mr. Keyes repeatedly expressed in many of his complaints to that his wounds were getting worse. As to the pressure ulcers he had when he arrived at ADF, he noted on July 10 that one of them, which was "a scab away" from being healed, had become a complete "hole," referring to the crater formed by pressure ulcers when they start to become more severe.

30.    Mr. Keyes also complained that ADF nurses were not trained in wound care, and he had concerns about some of their techniques. In fact, the nurses were not competent to treat Mr. Keyes's wounds, as none had been specially trained in wound care, and the medical unit at the ADF was not equipped to provide the care Mr. Keyes needed.

31. Yet, Mr. Vineyard responded to such concerns by writing to Mr. Keyes, inexplicably, that all of the nurses were qualified to provide wound care.

32. As a result of GEO's failure to adequately treat Mr. Keyes wounds and GEO's refusal to provide Mr. Keyes an adequate support surface mattress, Mr. Keyes's wounds worsened significantly.

33. At the end of July, Mr. Keyes's mother, Rosezina Keyes, wrote a letter to Department of Homeland Security, which was routed to ADF officials, stating that all of Mr. Keyes's medical conditions had gotten worse since his detention. She stated that the onsite doctor—Dr. Jeffrey Peterson—refused to adhere to Mr. Keyes's prior treatment requirements, and lack of specialized treatment would lead to further deterioration of his medical condition. She requested that Mr. Keyes be moved to another facility if his needs could not be met at ADF. Like Mr. Keyes's complaints, Mrs. Keyes's plea was essentially ignored by GEO.

34. In August, Mr. Keyes began asking repeatedly to go to a hospital. Although some of his complaints related to severe pain in his back (he had had back surgery after the car accident and, unsurprisingly, GEO refused to provide him with what he needed to minimize strain on his back), many related to his pressure ulcers. He constantly brought up the failure to provide him with an air mattress, which caused his wounds to get worse. He also repeatedly mentioned the failure to tend to his wounds with the correct supplies.

35. In the second half of August, Mr. Keyes started to raise concerns that the ulcers had gotten even worse, they were bleeding, and they smelled bad. He repeatedly noted that the sole extent of Dr. Peterson's response to concerns about his wounds—raised by him *and* the nurses—was to give him an oral antibiotic and instruct the nurses to keep doing a "wet to dry" dressing. In fact, Mr. Keyes needed intravenous antibiotics, debridement (removal) of the dead

tissue in the wounds, and at the very least, wound care directed by someone with special knowledge regarding treating pressure sores.

36.     By this point, the wound on Mr. Keyes's ankle was a crater, and the issue inside was complete black. The wound had also begun to connect to a new pressure ulcer on the back of his heel, which meant the wounds were rapidly deteriorating.

37.     Over and over again, Mr. Keyes asked to go to the hospital. In response to several of Mr. Keyes's written complaints, Mr. Vineyard wrote to Mr. Keyes on August 24 a list of every date when some type of medical services were provided to Mr. Keyes and a description of the treatment. For example, Mr. Vineyard wrote: "on 6/30/16 you were evaluated by a provider on 7/1/16 wound care was provided, on 7/4/16 wound care was provided and an EKG was performed," and so on. Mr. Vineyard concluded by stating "[i]t appears your assertions [that nothing is being done to address your medical concerns] are baseless."

38.     On August 21, Mr. Keyes wrote in a grievance that his ankle wounds were worse because they were not being tended to properly, and he needed to go to the hospital or at least have an air mattress. He also noted the smell of the wound on his buttocks. His grievance was marked "Rejected."

39.     At the end of August, Mr. Keyes wrote four grievances, each stating he needed to go to the hospital. He noted that the pressure ulcers smelled and were in terrible shape.

40.     In response, the ADF grievance coordinator wrote that Mr. Keyes's requests to go to the hospital were "being rejected."

41.     Mr. Keyes appealed the failure to provide him with an air mattress and the refusal to send him to the hospital, writing that the "entire back of [his] boxers [was] red from drainage

of blood" from the wound on his back. His appeals were denied, although ADF staff agreed to request an out-patient visit for him with an off-site medical provider.

42. But whenever the visit ultimately would have occurred, it would have been too late. In the evening of September 12, 2016, after Mr. Keyes had a high fever for several days, ADF staff took him to the emergency room at the hospital.

43. Mr. Keyes told the emergency room doctor that the wound to his ankle had been infected for weeks, he had had a high fever, headache, and chills for three days.

44. The doctor's initial description of Mr. Keyes's wounds was the following:

> Sacral decubitus ulcer [pressure ulcer] 6x7 cm circular lesion with . . . purulent [pus] drainage. LLE [left lower extremity] necrotic [dead tissue] 3x4cm circular lesion with obvious purulent drainage. . . . 2x3 cm open wound with purulent drainage to lateral heel. Medial malleolus with 2x2 cm circular necrotic lesion.

45. Mr. Keyes was admitted to the hospital and diagnosed, among other things, with sepsis—infection of the blood—and osteomyelitis—infection of the bone—of the ankle and foot. Sepsis and osteomyelitis are complications that occur with severe pressure sores.

46. On September 20, Mr. Keyes had his left leg amputated below the knee in an attempt to prevent the infection from spreading further.

47. The post-operation diagnosis of Mr. Keyes's leg found "chronic ankle wounds" that were "malodorous" with "exposed bone" in one of the wounds.

48. After the amputation, Mr. Keyes was extremely depressed. Staff at the hospital noted that he experienced an acute severe grief response, and he could not look at the remainder of his left leg for a week.

49. On September 27, the pressure ulcer of Mr. Keyes's sacral region was surgically debrided (the damaged tissue was removed). The surgeon "excis[ed] . . . 12x14 cm of skin and

necrotic subcutaneous tissue to the level of the sacrum." The ulcer was "malodorous, with overlying eschar [dead tissue], [and] purulent discharge."

50.     On October 6, Mr. Keyes was discharged from the hospital and sent back to ADF; on October 10, ADF sent Mr. Keyes back to the hospital.

51.     After continuing medical complications, the case against Mr. Keyes was dismissed because of health concerns and he was released from custody.

52.     In the months since, Mr. Keyes has been in and out of the hospital, battling sepsis and osteomyelitis from the wound in his sacral region. Mr. Keyes has seen numerous doctors and had multiple procedures, but he has been informed that there is nothing more that could be done to try to rid him of the infection other than an extreme amputation of the pelvis. Although he has recently had multiple surgeries to try to manage the infection, doctors have told him that he likely does not have much longer to live.

### *Despite being aware of the substantial risk that ADF was not meeting Mr. Keyes's medical needs, USMS Employees failed to intervene to ensure that Mr. Keyes was provided adequate healthcare.*

53.     The USMS is responsible for the safety and care of all federal pre-trial detainees until their acquittal or their conviction and delivery to federal Bureau of Prisons ("BOP").

54.     Although the USMS contract with GEO provided that GEO was to provide the full range of medical care required within ADF and was financially responsible for all medical treatment provided to federal detainees at ADF, the USMS and its Employees had a non-delegable duty to provide adequate healthcare for all federal pre-trial detainees under custody of the USMS.

55.     Per the USMS prisoner healthcare standards, the USMS has the authority to acquire and pay for reasonable and medically necessary care (to include emergency medical care) to ensure the wellbeing of all pre-trial detainees under the custody of the USMS.

56.     Because Mr. Keyes remained under the authority of the USMS even when he was detained at ADF, and USMS had contractual authority to ensure compliance with its contract with GEO in numerous ways, USMS Employees at any time could have ordered ADF to provide different or additional care to Mr. Keyes or had Mr. Keyes transferred to the hospital or another federal detention facility able to meet his needs.

57.     Yet although Mr. Keyes, his family members, and his criminal defense team repeatedly informed the USMS Employees that ADF was not meeting his medical needs, a fact that the USMS Employees also would have learned from the USMS deputies who several times escorted Mr. Keyes to court appearances at which his attorney specifically described how Mr. Keyes's needs were being neglected, the USMS Employees continually refused, until it was too late, to transfer Mr. Keyes to a hospital or another detention facility that could meet his needs.

58.     Starting the day he was arrested, June 24, 2016, the USMS Employees housed Mr. Keyes at GEO's ADF, which USMS Fleck specifically represented was the best place for Mr. Keyes given his medical condition.

59.     When the USMS Employees designated Mr. Keyes to ADF, they were aware that Mr. Keyes was in a wheelchair and not capable of walking or standing, and that he had "extensive medical needs." They also believed that he had spine tissues and infected tissue on his back.

60. In light of this knowledge, the USMS Employees could have assigned Mr. Keyes to one of the detention facilities operated by BOP for inmates with chronic conditions not well controlled with medication, complex health problems, or intractable medical conditions.

61. Instead, the USMS sent Mr. Keyes to ADF, a facility with one doctor for 600 detainees that essentially provided only outpatient care (or "ambulatory" care). Further, ADF was owned and operated by GEO, a company with a widely known and documented history of failing to provide adequate medical care to inmates at its facilities. There were also red flags regarding ADF itself, including a 2012 death at ADF likely caused by failure to provide adequate and timely medical care and the fact that in 2015, the National Commission on Correctional Healthcare placed ADF's accreditation on probation.

62. Within the first week Mr. Keyes spent at ADF, it became clear to his family and his defense team that ADF was not meeting, and was not able to meet, Mr. Keyes's medical needs, a concern that was communicated to USMS Employees in numerous and various ways over the next few months.

63. For instance, on June 28, 2016, ADF officials told USMS Fleck that Mr. Keyes's father had called with concerns that ADF was not providing Mr. Keyes adequate medical care and did not have the proper medical supplies.

64. At a June 29, 2016, detention hearing, Mr. Keyes's defense attorney informed the court that ADF had not been providing the care that Mr. Keyes needed, and his attorney did not believe ADF had the capacity to provide such care. Specifically, Mr. Keyes's attorney explained that to his knowledge, Mr. Keyes had only been receiving three medications, which was nowhere near the number of medications he needed, and, particularly, Mr. Keyes had not been receiving his pain medication and therefore was in constant pain; Mr. Keyes had not been receiving an

inhaler, which he needed because of a collapsed lung from the car accident; Mr. Keyes was not being rotated every two hours, which was necessary because of bed sores; and Mr. Keyes had not been able to do pressure releases every ten to fifteen minutes, also necessary because of bed sores.

65.     At the June 29th hearing, Mr. Keyes's attorney further explained that Mr. Keyes's spine was deteriorating; he had a history of urinary tract infections and needed a catheter that had to be changed daily; and before he was arrested, he had a wound nurse who treated his bed sores every other day, he went to therapy two to three times a week, and he got skin massages to help prevent bed sores. Given these substantial needs, Mr. Keyes's attorney expressed grave concerns that ADF could provide Mr. Keyes adequate care.

66.     Despite Mr. Keyes's medical needs, the court refused to grant Mr. Keyes release on bond. Moreover, although USMS deputies had escorted Mr. Keyes to court, and therefore heard Mr. Keyes's attorney's concerns about ADF's providing Mr. Keyes adequate medical care, the USMS Employees did not transfer Mr. Keyes to a facility better equipped to care for his needs, nor do anything to ADF could provide and was providing adequate care.

67.     In fact, no USMS Employee took any action in response to Mr. Keyes's attorney's statements at the hearing.

68.     Indeed, at each of the approximately four or five times Mr. Keyes appeared in court when he was detained at ADF, Mr. Keyes's attorney raised concerns about the medical care ADF was providing. But even though USMS deputies were at each such court appearance with Mr. Keyes and heard such concerns, as well as viewed Mr. Keyes's deteriorating condition, on information and belief, they did not take any action to determine whether the raised concerns

were legitimate and whether, in fact, Mr. Keyes was not receiving adequate medical care at ADF.

69.     Thus, Mr. Keyes continued to be detained at ADF, and throughout the next two-and-a-half months of his detention (the period before he landed in the hospital and had his leg amputated), he, his defense team, and his family repeatedly raised concerns to USMS Employees about ADF's failure to provide him needed medical care.

70.     For instance, on July 6, 2016, Mr. Keyes spoke with USMS Thomas, who was at ADF and had an in-person conversation with Mr. Keyes, about ADF's not having the proper medical supplies to treat Mr. Keyes's wounds. Mr. Keyes specifically informed USMS Thomas of the necessary supplies that ADF did not have. USMS Thomas responded that it was a financial issue. He then told Mr. Keyes that, from a medical perspective, he was in the best place for him.

71.     USMS Thomas and/or other USMS Employees were frequently at ADF observing the detention of USMS detainees and ensuring that GEO's contractual obligations, including its obligation to provide adequate medical care to USMS detainees, were met. USMS also conducted a more formal quality assurance review ("QAR"), at least once a year, to ensure GEO's performance under the contract was satisfactory.

72.     On July 7th, Mr. Keyes's father contacted Mr. Vineyard, again expressing concerns that ADF was not taking care of Mr. Keyes's medical needs and did not have the medical supplies Mr. Keyes needed. Mr. Keyes's father's concerns were passed on to USMS Fleck, USMS Thomas, and USMS Regional Director of Operations, Cheryl Nelson, who were told that Mr. Keyes's father called ADF daily to complain about the medical attention his son

was receiving. Upon information and belief, neither inquired into whether Mr. Keyes's concerns were justified or took any other action to ensure Mr. Keyes was receiving adequate care.

73.      Also on July 7th, an investigator working for Mr. Keyes's attorney called USMS Fleck with concerns about Mr. Keyes's medical care at ADF. Specifically, the investigator informed USMS Fleck that Mr. Keyes had the following needs that ADF was not meeting: an inhaler for breathing issues, pain medications for chronic pain, enough catheters, and wound care.

74.      USMS Fleck contacted Dr. Peterson, who essentially told her that per Mr. Keyes's medical records, Mr. Keyes was receiving the medical supplies and treatment that was indicated as necessary by his records. USMS Fleck conveyed this information to Mr. Keyes's investigator and also told her that ADF was the best facility they had for medical treatment and Mr. Keyes was getting as much treatment as possible.

75.      Upon information and belief, USMS Fleck unreasonably did not take any further action in response to the investigator's concerns, such as contacting Mr. Keyes's regular medical providers (those he saw before he was arrested) to ensure that what Dr. Peterson told her about Mr. Keyes's needs was, in fact, an accurate statement of such needs. Nor did USMS Fleck speak to any other staff at ADF to confirm Dr. Peterson's representations or review any of Mr. Keyes's records from ADF.

76.      In fact, had USMS Fleck looked any further into the matter, she would have learned that Dr. Peterson had made at least one misrepresentation, if not more. While Dr. Peterson stated that Mr. Keyes's prior medical records showed that he had only been receiving home health care once a week, the medical records ADF had obtained from Mr. Keyes's home health care company in fact showed that as of June 8, 2016, approximately two weeks before Mr.

Keyes arrived at ADF, the dressings on Mr. Keyes's wounds were being changed three times per week. Yet USMS Fleck and other USMS Employees missed this red flag indicating that Dr. Peterson was not acting as a reasonably careful physician in his position should act because no USMS Employee ever took any action in response to Mr. Keyes's, his family's, and his criminal defense attorney's complaints beyond contacting Dr. Peterson.

77.    On July 11th, Mr. Keyes's attorney's investigator emailed USMS Fleck with some additional concerns about Mr. Keyes's medical issues. The investigator explained Mr. Keyes had a pretty severe open wound on his ankle, which actually was a hole measuring approximately 2 cm deep. The investigator specifically listed supplies that seemed necessary to treat the wound but that apparently ADF did not have. The investigator also expressed concerns that, among other things, the dressings on Mr. Keyes's wounds were not being changed frequently enough.

78.    In response, USMS Fleck again unreasonably relied solely on Dr. Peterson's assurances that the wound care ADF provided Mr. Keyes was adequate, passed on such assurances to Mr. Keyes's attorney's team, and took no further action.

79.    At the end of July, on information and belief, USMS Employees were forwarded the letter written by Mr. Keyes's mother expressing significant concerns about the medical care ADF provided Mr. Keyes, and in particular, Dr. Peterson's failure to provide adequate treatment to Mr. Keyes.

80.    Upon information and belief, USMS Employees took no action or no reasonable action in response to Mr. Keyes's mother's letter, such as investigating whether her complaints were justified and determining whether Mr. Keyes's medical condition had, in fact, worsened since he arrived at ADF.

81.     On August 23rd and 24th, Mr. Keyes's attorney's investigator contacted USMS Fleck and USMS Thomas with updated concerns about his medical care, which included that the bandages for his wounds were not getting changed frequently enough and he had new pressure wounds—as a result of not getting an appropriate mattress—that looked "pretty bad."

82.     USMS Thomas's response essentially amounted to representations that he was under the impression Mr. Keyes's medical care was adequate, and even better than what he was receiving when he was not in custody. USMS Thomas asserted that he believed Mr. Keyes only complained about his medical care because he just did not like being in custody—yet on information and belief, USMS Thomas had no legitimate reason upon which to base such a belief. USMS Thomas further responded that Dr. Peterson was very frustrated with Mr. Keyes because of all the complaints, although it is unclear what relevance USMS Thomas thought this had to whether Dr. Peterson was meeting Mr. Keyes's medical needs.

83.     USMS Thomas again assured the investigator that ADF was the best place, medically, for Mr. Keyes and Dr. Peterson was very competent. Yet, on information and belief, USMS Thomas had no information that would allow him to determine whether ADF and Dr. Peterson in fact could provide the specialty wound care that Mr. Keyes needed.

84.     In fact, upon information and belief, no USMS Employee took any action to determine whether Dr. Peterson and the nurses at ADF were adequately trained and competent in complicated wound care, a medical specialization that requires special training and expertise. Nor did any USMS Employee verify that ADF had the necessary supplies and resources to provide adequate wound care under the circumstances.

85. USMS Fleck's response to the investigator's latest concerns was, unsurprisingly, to contact Dr. Peterson. The only action USMS Fleck took in response to Dr. Peterson's responses to the concerns raised was to convey such responses to the investigator.

86. Upon information and belief, neither USMS Thomas nor USMS Fleck nor any other USMS Employee took any action to verify the accuracy of Dr. Peterson's information, or to ensure that the care Dr. Peterson said was being provided to Mr. Keyes was indeed adequate. For instance, had USMS Fleck looked further into Dr. Peterson's responses, she would have realized his representations that Mr. Keyes did not need a special support surface mattress and Mr. Keyes did not have a special support surface mattress at home were false.

87. On or around August 15, 2016, ADF submitted a request to USMS for authorization to seek an appointment to have Mr. Keyes's concerns about his medical condition evaluated. USMS either denied the request or took no timely action, because a second request was submitted on or around August 29, 2016.

88. On August 30th, the warden at ADF emailed USMS Fleck that Mr. Keyes's mother continued to call with the same complaints regarding wound care and infection. USMS Fleck responded that she had also heard from Mr. Keyes's mother and "Dr. Peterson [had] been excellent at keeping [her] informed of Keyes' situation and [would] be sending yet another email about everything [Mr. Keyes had] complained about lately and how it is inaccurate." On information and belief, USMS Fleck took no additional action to determine whether Mr. Keyes was receiving adequate medical care at ADF.

89. But apparently Mr. Keyes's complaints about his deteriorating health could not have been that inaccurate, because two weeks later he was in the hospital having his leg amputated.

90.     During and after Mr. Keyes's hospitalization, USMS Fleck finally started to express some concerns about ADF's ability to meet Mr. Keyes's need. In an October 5th bond hearing (Mr. Keyes's attorney and the United States attorney filed a joint motion requesting that Mr. Keyes be released on a personal recognizance bond), USMS Fleck testified that while she believed ADF was able to originally meet Mr. Keyes's medical needs, ADF was no longer able to do so.

91.     Yet, when Mr. Keyes was released from the hospital in early October, USMS Employees sent him back to ADF. USMS Fleck emailed Mr. Keyes's attorney's investigator on October 11th regarding the fact that Mr. Keyes had been placed back at ADF; in her email, USMS Fleck explained Mr. Keyes would stay at ADF because ADF staff said they could provide the medical treatment that his doctors at the hospital said he needed. USMS Fleck took no action to verify whether ADF's representations were true.

92.     On or around October 10th, Mr. Keyes was again admitted to the hospital. On October 31st, USMS Fleck informed Ronnie's attorney and investigator that she had just been notified that his condition had worsened and he was likely dying, with the doctors estimating that Mr. Keyes would not live longer than three months.

93.     Mr. Keyes remained in the hospital until mid-November, when the United States agreed to dismiss the charges against him.

### *USMS Employees knew or should have known that there was a substantial risk that ADF was not providing adequate healthcare to Mr. Keyes.*

94.     USMS Fleck's, USMS Thomas's, and other USMS Employees' failure to take anything but a cursory look into the repeated complaints from Mr. Keyes, his family, and his criminal defense team about the medical care he was receiving at ADF constituted a breach of

their duty to provide Mr. Keyes adequate healthcare while he was under the custody of the USMS as a federal pre-trial detainee.

95.     Rather than make any real effort to investigate whether any of Mr. Keyes's complaints were justified, the USMS Employees relied exclusively on GEO's representations that Mr. Keyes was receiving adequate medical care.

96.     However, in light of the numerous complaints and GEO's long and well-known history of failing to provide adequate medical care to detainees at its facilities, with which the USMS Employees were undoubtedly familiar, it was patently unreasonable for the USMS Employees not to take any further steps to determine whether Mr. Keyes's medical needs were being met.

97.     For years, GEO's ability to provide adequate medical care to detainees in its facilities across the country (and in other countries) has been seriously questioned. For instance, in 2012, the Department of Justice's Civil Rights Division reported that detainees at a youth correctional facility run by GEO in Mississippi were not receiving constitutionally adequate care, and specifically found that the facility was deliberately indifferent to the serious medical needs of the youth.

98.     Similarly, a September 2015 report by the United States Commission on Civil Rights—a commission of the United States federal government—found that certain GEO facilities were not complying with basic medical standards set by the government regarding providing healthcare to detainees.

99.     The Commission pointed to several examples of inmates being denied adequate medical care at GEO facilities, including a forty-six-year-old man detained at ADF who died of a heart attack in April 2012 after the facility, according to a report by the ICE Office of Detention

Oversight ("ODO"), failed to provide him access or timely access to emergent, urgent, or non-emergent medical care. The ODO further found that GEO's failure to properly train its nursing staff played a significant role in the detainee's death, as did the delay in transferring the detainee to a higher-level care facility.

100.    Indeed, in August 2015, the National Commission on Correctional Healthcare ("NCCHC") placed ADF's accreditation—a requirement under GEO's contract with the USMS—on probation for lack of compliance with NCCHC's standards for health services in correctional facilities. NCCHC's decision to place ADF on probation was due in part to ADF's failure to ensure that nurses were properly trained in in nursing protocols. Yet the death of the ADF detainee in April 2012 and Mr. Keyes's deterioration while at ADF were partially caused by the exact same deficiency, namely failure by GEO to ensure that nurses were properly trained in providing certain types of care to detainees.

101.    Given the ODO's findings regarding the April 2012 death at ADF, and NCHHC's 2015 probation decision, USMS Employees knew or should have known about ADF's history of failing to ensure its nurses were properly trained when USMS Employees decided to place Mr. Keyes at ADF and when Mr. Keyes or those acting on his behalf complained that ADF did not provide him adequate care for his wounds.

102.    The United States Commission on Civil Rights also discussed the April 2015 death of a detainee at a GEO facility in California who died three days after he was admitted to the hospital and diagnosed with cancer. The inmate had displayed "alarming" signs for three weeks before his death, but medical staff never provided him any treatment.

103.    According to a 2015 Huffington Post article—which states that GEO has been the subject of hundreds of lawsuits, ranging from sexual battery to medical neglect to wrongful

death—a government report found that GEO's medical mismanagement at the same facility directly led to the death of at least one detainee in March 2012. And, the American Civil Liberties Union ("ACLU") and nine other legal service providers and human rights organizations formally voiced concerns about the poor quality of health care offered at the facility, emphasizing abhorrent accounts of medical negligence.

104.    The ACLU also drafted a report in June 2014 explaining that because GEO is responsible for the costs of providing medical services to detainees, it has perverse incentives to limit costs by reducing medical staff and withholding treatment to maximize profit.  The ACLU stated that it was "gravely concerned" about the ability of some private prisons such as those run by GEO to provide timely care in urgent situations, and it had heard numerous reports of prisoners at such facilities being denied both urgent treatment and routine preventative care, as well as prisoners with chronic diseases receiving inconsistent treatment. The ACLU noted that the BOP itself found the medical care at at least one GEO-run facility in Texas inadequate, with the lack of healthcare greatly impacting inmate health and well-being.

105.    That GEO facility in Texas was the site of a riot in 2009 due partly to poor healthcare; it occurred after an inmate with epilepsy died of a seizure in solitary confinement. There were signs that the inmate had not received any recent medical attention before his death. In its 2014 report, the ACLU reported that inmates at the same facility continued to complain of the grave lack of medical.

106.    Other nonprofit watchdog organizations—Grassroots Leadership and the Center for Media and Democracy's SourceWatch—have issued reports in the last few years about the lack of adequate healthcare at GEO's detention facilities. SourceWatch explained that one of the primary critiques of for-profit prison operators, like GEO, is that profit-focused measures lead to

negative consequences such as the withholding of medical care, since the cost of providing medical care comes out of GEO's bottom line.

107.    But financial considerations do not just form a basis for GEO's decisions regarding medical care for detainees, they also play a role in the USMS's decisions regarding the same. Although GEO is responsible for medical costs for care at ADF, the USMS is responsible for paying for all medical care and treatment outside the facility, such as when a detainee must go to a hospital in the community. These sorts of considerations may have played a role in the USMS Employees' decisions to leave Mr. Keyes at ADF, despite the fact that they knew or should have known that his medical needs were not being met, instead of moving him to an off-site medical facility, as well as USMS Employees' failure to timely approve the off-site medical provider appointment for Mr. Keyes for which GEO had sought approval.

108.    However, regardless whether cost was a consideration in the USMS Employees' failure to reasonably respond to Mr. Keyes's, his family's, and his attorney team's concerns about the medical care ADF was providing, given the repeated and consistent complaints and GEO's and ADF's history of failing to provide adequate medical care to detainees, USMS Employees knew or should have known that there was a substantial risk Mr. Keyes's serious medical needs were not being met.

109.    Nevertheless, USMS Employees unreasonably, recklessly, and—in light of GEO's and ADF's history—unjustifiably chose to take Dr. Peterson's representations about Mr. Keyes's medical situation at face value, without verifying the truth of Mr. Keyes's representations or taking any action to independently determine whether ADF was providing adequate care and, indeed, whether Dr. Peterson and other ADF medical staff were qualified to provide and evaluate the type of care Mr. Keyes needed. In doing so, the USMS Employees were

negligent in meeting their duty to provide Mr. Keyes adequate medical care as a USMS detainee, and they are responsible for the dire consequences to Mr. Keyes's health that occurred as a result.

## V.     CLAIM FOR RELIEF

### Federal Torts Claim Act - Negligence

110.    Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

111.    The USMS Employees were acting within the scope of their office or employment in their actions and inactions at all times relevant to this Complaint.

112.    Defendant United States is vicariously liable for the acts and omissions of the USMS Employees that were committed within the course and scope of their employment.

113.    By voluntarily assuming custody of Mr. Keyes such as to deprive him of his normal opportunities to obtain medical care and treatment, USMS and USMS Employees owed Mr. Keyes a duty of care to provide for his medical needs.

114.    Because Mr. Keyes was dependent on and under the control USMS and USMS Employees, Mr. Keyes had a special relationship with USMS and the USMS Employees such that USMS and USMS Employees had a duty to exercise reasonable care in protecting Mr. Keyes's health and safety.

115.    Moreover, 18 U.S.C. § 4086 and 28 C.F.R. 0.111 imposed a duty on USMS Employees to provide adequate healthcare as required to support Mr. Keyes when he was under the custody of the USMS and housed at ACDF.

116.    The USMS Employees had a non-delegable duty to ensure that ADF provided adequate healthcare to Mr. Keyes while he was a federal pre-trial detainee under USMS custody.

The fact that USMS confided the duty of providing care to Mr. Keyes to GEO did not relieve USMS of its duty of care to Mr. Keyes.

117. Additionally, under the USMS contract with GEO, the USMS Employees retained a duty to ensure that the actions of ADF employees/agents/contractors in providing individual care to USMS detainees met contractual and contractually incorporated standards for medical care for USMS detainees at ADF.

118. USMS and the USMS Employees breached their common law and statutory duties to Mr. Keyes by, inter alia: (1) placing Mr. Keyes at a detention facility they knew or should have known could not meet his medical needs; (2) failing to adequately supervise, investigate, and review the acts of ADF employees/agents/contractors once they knew or should reasonably have known that Mr. Keyes's medical condition was worsening significantly; (3) failing to adequately supervise, investigate, and review the acts of Dr. Peterson and other medical staff once they knew or should reasonably have known that Dr. Peterson was not acting in the same manner as a reasonably careful general practitioner would have in treating or caring for Mr. Keyes; (4) once they knew or should reasonably have known that Mr. Keyes's medical condition was worsening significantly, failing to adequately ensure that ADF had the resources and supplies to meet Mr. Keyes's medical needs and that ADF medical staff, including Dr. Peterson, had the training and expertise to evaluate Mr. Keyes's condition and treat Mr. Keyes's wounds; (5) failing to transfer Mr. Keyes to another detention facility or an offsite medical facility, such as a hospital, once they knew or should reasonably have known that Mr. Keyes's medical condition was worsening significantly; and (6) failing to approve a timely off-site medical appointment for Mr. Keyes.

119.    Because USMS and USMS Employees knew or should reasonably have known that ADF could not and was not providing adequate medical care and treatment to Mr. Keyes, and it thus was, or should have been to an ordinarily prudent person in their position, reasonably apparent that that they needed to take action to protect Mr. Keyes from the harm or the reasonably foreseeable risk of harm caused by ADF's failure to adequately treat Mr. Keyes, they had a duty to take necessary action to protect Mr. Keyes from such harm.

120.    By not acting to protect Mr. Keyes from the harm caused by ADF's failure to provide Mr. Keyes adequate medical care once they knew or should reasonably have known of such failure, USMS and USMS Employees failed to act as a reasonably prudent person in their position would have, thus breaching their duty of care to Mr. Keyes to provide adequate healthcare while he was under custody of the USMS.

121.    But for the acts and omissions of the USMS and the USMS Employees, Mr. Keyes would not have been suffered the injuries that he did, including, but not limited to, the amputation of his leg and the current infection of his pelvis and related complications, and such harm was a natural and foreseeable consequence of the USMS and the USMS Employees' acts and omissions.

122.    USMS and USMS Employees' failure to reasonably ensure Mr. Keyes's received adequate medical care despite their ability and authority to do so was a substantial factor in causing Mr. Keyes's harm, and it was reasonably foreseeable to a reasonable person in the position of the USMS and USMS Employees that such failure would cause the harm or a similar harm that Mr. Keyes suffered and is suffering.

123.    As a direct and proximate cause and consequence of the USMS and USMS Employees' conduct, Mr. Keyes has suffered and continues to suffer severe injuries and damage to his health and extreme physical and mental pain and suffering.

124.    Although the USMS and the USMS Employees knew or should have known that Mr. Keyes's health and safety was at risk due to ADF's failure to provide him adequate medical care, the USMS and the USMS Employees failed to fulfill their duty to ensure that Mr. Keyes's medical needs were met by ADF, negligently and recklessly disregarded the risk of harm to Mr. Keyes.

125.    The USMS and USMS Employees' failure to intervene in the medical care ADF was providing to Mr. Keyes, either by reasonably ensuring that ADF was in fact providing adequate medical care to Mr. Keyes or by transferring Mr. Keyes somewhere that could meet his medical needs, created a substantial risk of serious harm because it was highly probable that failure to provide proper care for Mr. Keyes's condition would cause Mr. Keyes serious injury, substantial suffering, and/or death.

126.    In light of the repeated concerns raised by Mr. Keyes, his family, and his criminal defense team, as well as GEO's and ADF's known history of failing to provide adequate medical care to detainees, it was obvious that failure to ensure that Mr. Keyes was receiving adequate care posed a substantial risk of serious harm. Thus, the USMS and USMS Employees knew that their failure to take any reasonable action in response to complaints of inadequate care by Mr. Keyes and those acting on his behalf posed a substantial risk of serious harm.

127.    Despite their knowledge that there was a substantial risk of serious harm to Mr. Keyes if they did not take appropriate action to ensure that his medical needs were being met, the USMS Employees deliberately chose not to take such action. The USMS Employees therefore

recklessly disregarded the obvious and substantial risk of serious harm to Mr. Keyes created by their failure to take appropriate action to ensure that his medical needs were being met.

128.     As a result of the USMS and USMS Employees' conduct, Plaintiff has suffered and continues to suffer economic and noneconomic damages, losses, and injuries, in an amount to be determined at trial. General and compensatory damages to which Plaintiff is entitled include, inter alia, pain and suffering, impairment in the quality of life, upset, anger, depression, and all other damages as allowed under law.

129.     Mr. Keyes is also entitled to punitive damages against the USMS Employees because their acts and omissions were taken maliciously, willfully, or with reckless or wanton disregard of Mr. Keyes's health and safety.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant, in an amount to be determined by following a trial, and award him all relief allowed by law, including, but not limited to, the following:

a.      Appropriate and equitable relief including but not limited to declaratory and injunctive remedies;

b.      Compensatory damages, including, but not limited to, those for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

c.      Punitive damages for all claims allowed by law in an amount to be determined at trial;

d.      Pre-judgment and post-judgment interest at the highest lawful rate;

e.      Attorney fees and case costs;

f.      Such further relief as justice requires or the law allows.


Respectfully submitted this 12th day of June 2018.

                                   KILLMER LANE & NEWMAN, LLP

                                   *s/* David A. Lane
                                   David A. Lane
                                   1543 Champa Street, Ste. 400
                                   Denver, CO 80202
                                   dlane@kln-law.com