# EXHIBIT 1

*United States of America vs.*

*Ronnie Nathaniel Keyes*

*Audio Recorded Arraignment/Detention/Discovery Hearing*

*June 29, 2016*



Stevens-Koenig Reporting
700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Case 1:18-cv-01469-JLK   Document 47-1   Filed 11/16/18   USDC Colorado   Page 3 of 10

United States of America vs.                          Audio Recorded Arraignment/Detention/Discovery Hearing
Ronnie Nathaniel Keyes                                                                    June 29, 2016

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF COLORADO
 3   Case No. 16-cr-00195-MSK-1
     _____
 4
 5   UNITED STATES OF AMERICA,
 6          Plaintiff,
 7   vs.
 8   RONNIE NATHANIEL KEYES,
 9          Defendant.
10   _____
11          Proceedings before MICHAEL E. HEGARTY,
12   United States Magistrate Judge, United States
13   District Court for the District of Colorado,
14   commencing at 10:32 a.m., June 29, 2016, in the
15   United States Courthouse, Denver, Colorado.
16   _____
17          WHEREUPON, THE ELECTRONICALLY RECORDED
18   PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...
19   _____
20                    APPEARANCES
            EDWIN GARRETH WINSTEAD, III, Assistant
21   United States Attorney, appearing for the plaintiff.
            DAVID EDWARD JOHNSON, Federal Public
22   Defender, appearing for the defendant.
     _____
23
       AUDIO RECORDED ARRAIGNMENT/DETENTION/DISCOVERY HEARING
24
25
```

**Page 2**

```
 1                  P R O C E E D I N G S
 2          (Whereupon, the within electronically
 3   recorded proceedings are herein transcribed, pursuant
 4   to order of counsel.)
 5          THE COURT:  Case Number 16-cr-195, The
 6   United States of America versus Ronnie Nathaniel
 7   Keyes.
 8          MR. WINSTEAD:  Good morning, Your
 9   Honor.  Garreth Winstead on behalf of the United
10   States.
11          THE COURT:  Thank you.  Mr. Johnson,
12   good morning.
13          MR. JOHNSON:  Good morning, Your Honor.
14   David Johnson on behalf of Mr. Keyes.  Mr. Keyes is
15   in the back in the wheelchair.
16          THE COURT:  Good morning, Mr. Keyes.
17          THE DEFENDANT:  Good morning.
18          THE COURT:  I don't have any paperwork
19   in front of me.
20          MR. JOHNSON:  I am still -- I am in the
21   process of completing it now.
22          THE COURT:  Okay.  Very good.
23   (Indiscernible.)
24          (Off the record discussion.)
25          THE COURT:  Okay.  All right.  I have
```

**Page 3**

```
 1   before me the discovery conference memorandum and
 2   order.  First of all, would you like me to further
 3   advise your client or read the indictment,
 4   Mr. Johnson?
 5          MR. JOHNSON:  No, Your Honor.  I waive
 6   further reading of the advisement and enter
 7   not-guilty plea.
 8          THE COURT:  Thank you.  All right.
 9   Speedy trial dates here.  Thirty days, July 24th; 70
10   days, September 2nd; 90 days, September 22nd.  For
11   the government, discovery July 1st.  Mr. Johnson,
12   July 26th.
13          And with regard to detention,
14   Mr. Johnson?
15          MR. JOHNSON:  We are seeking a bond in
16   this case.
17          THE COURT:  Okay.  Mr. Winstead.
18          MR. WINSTEAD:  Your Honor, the United
19   States does request detention.  In this case, as the
20   court can see in the defendant's criminal history,
21   there are a number of failures to appear or failures
22   to comply with probation, revocations of probation.
23   There's also a pretty lengthy history of both
24   resisting police officers or -- or battery towards
25   police officers, and also domestic violence, as well
```

**Page 4**

```
 1   as the controlled substance convictions or arrests.
 2          In this case, I guess about two months
 3   before the events that gave rise to these charges,
 4   police officers encountered the defendant for some
 5   traffic-related encounter, and the defendant made
 6   some pretty significant threats against police
 7   officers, including saying that if they encountered
 8   or arrested him in the future that he would shoot
 9   them with his AR or AK, or something like that.
10          In this particular case, the encounter
11   with the defendant came about after some
12   domestic-violence-related reporting.  There was an
13   encounter a couple days before, that resulted in some
14   scratches to the defendant's girlfriend.  And then
15   after that, the defendant's girlfriend reported
16   receiving threats; specifically, receiving a text
17   that said something in the nature of, It will be
18   funny when your children don't have a mother.  And
19   then additional events like the -- like her garage
20   door being spray painted with a message and windows
21   being broken out with weights, and things of that
22   nature.
23          That gave rise to the encounter with
24   the defendant.  And, in this case, when the police
25   encountered the defendant, he did have an AR in his
```

Case 1:18-cv-01469-JLK Document 47-1 Filed 11/16/18 USDC Colorado Page 4 of 10

United States of America vs.
Ronnie Nathaniel Keyes

Audio Recorded Arraignment/Detention/Discovery Hearing
June 29, 2016

Page 5

1 possession. Essentially, an M16 with a very short
2 barrel and without a butt stock. So that it's in the
3 form of a pistol, but it still fires the rifle round
4 and -- and everything.
5     THE COURT: Illegally long -- illegally
6 short barrel or --
7     MR. WINSTEAD: Your Honor, I believe
8 that it does fit the definition of a pistol because
9 it doesn't -- it's made without a butt stock.
10     THE COURT: But it fires a 223?
11     MR. WINSTEAD: But it still fires a
12 223. I don't know how easy it is to shoot
13 accurately, but it's certainly a lot of firepower for
14 a pistol. And it was fully loaded with a 30-round
15 magazine, and I believe there was an additional
16 magazine in the car.
17     THE COURT: So what -- the stop here
18 was occasioned by what?
19     MR. WINSTEAD: So it wasn't a stop. In
20 the investigation of the threats to the defendant's
21 girlfriend, they received information that he was
22 parked in a parking lot. They responded there. He
23 did have an active warrant for his arrest at the
24 time, and so that was the encounter. It wasn't
25 actually a stop, they just approached him in a

Page 6

1 parking lot.
2     But, again, the -- the pistol, the AR
3 pistol that he had in his possession, corresponded
4 with the threats that he had made to police officers
5 a couple months previously. And so police officers
6 approached with extreme caution knowing that history,
7 and the defendant resisted them putting him into
8 custody.
9     All of those things, Your Honor, added
10 on the fact that the defendant spontaneously made
11 verbal reference to the pistol. I believe he said
12 something to the effect that it's his woman's gun or
13 it's his girl's gun. Not exactly an admission to
14 possessing it, but an admission as far as knowing
15 that the pistol was there and being in knowing
16 control of it, and so that goes to the weight of the
17 evidence in this case.
18     THE COURT: So Mr. Keyes is in a
19 wheelchair. Where was the pistol?
20     MR. WINSTEAD: The pistol was on the --
21 sort of on the floorboards, leaning up against the
22 center console or whatever -- essentially, arms'
23 reach, like this.
24     THE COURT: Okay. And was there a
25 round in the chamber?

Page 7

1     MR. WINSTEAD: That, I can't recall,
2 Your Honor. It did have an inserted magazine that
3 was loaded. I'm not sure if there was a round in the
4 chamber.
5     THE COURT: Okay.
6     MR. WINSTEAD: And so for all those
7 reasons, the United States would request detention.
8     THE COURT: Okay. Mr. Johnson.
9     MR. JOHNSON: Your Honor, may I have
10 him move over here?
11     THE COURT: Of course.
12     MR. JOHNSON: Thank you.
13     THE COURT: Yeah. Well, if you guys
14 think you can't --
15     UNKNOWN SPEAKER: Oh, it's --
16     UNKNOWN SPEAKER: Well, I'm just saying
17 there's only two of us.
18     UNKNOWN SPEAKER: If you can -- is
19 there a particular reason why you need him over
20 there?
21     MR. JOHNSON: I'd like to just confer
22 with him. I can be over there if you need me to.
23     UNKNOWN SPEAKER: No. No. Go ahead.
24     MR. JOHNSON: I'll walk --
25     THE COURT: I -- I don't mind you

Page 8

1 standing (indiscernible).
2     MR. JOHNSON: Do you want to switch
3 sides?
4     MR. WINSTEAD: Sure.
5     MR. JOHNSON: You want to switch
6 tables?
7     MR. WINSTEAD: Sure.
8     MR. JOHNSON: Is that all right with
9 you?
10     THE COURT: That's fine. Yes. Please.
11 Let's do whatever we need to do.
12     MR. JOHNSON: Thank you, Judge.
13     THE COURT: Thanks, Eric.
14     MR. JOHNSON: Can I have a moment, Your
15 Honor --
16     THE COURT: Yes.
17     MR. JOHNSON: -- to talk with him?
18 Thank you.
19     Thank you, Your Honor.
20     THE COURT: Sure. There's a pending
21 case in Denver. Did that arise out of different
22 circumstances than the current case?
23     MR. JOHNSON: I believe it is the exact
24 same circumstances.
25     THE COURT: And do -- do both

Case 1:18-cv-01469-JLK   Document 47-1   Filed 11/16/18   USDC Colorado   Page 5 of 10

United States of America vs.
Ronnie Nathaniel Keyes

Audio Recorded Arraignment/Detention/Discovery Hearing
June 29, 2016

Page 9

1  jurisdictions ever prosecute?
2           MR. JOHNSON:  Ever?  I don't know.  I
3  don't know what their intent is on this -- in this
4  situation.
5           THE COURT:  Okay.  Mr. Winstead.
6           MR. WINSTEAD:  I believe that the
7  current pending charges are related to the same case,
8  and I don't believe it's very common for both
9  jurisdictions to prosecute.  I think it's --
10          THE COURT:  Okay.  So Denver would
11 likely dismiss?
12          MR. WINSTEAD:  That's my understanding,
13 Your Honor.
14          THE COURT:  Okay.  Very good.  Go
15 ahead, Mr. Johnson.
16          MR. JOHNSON:  Your Honor, I do believe
17 there are a combination of conditions that can ensure
18 the safety of the community and assure Mr. Keyes's
19 presence in court.
20          Obviously, Mr. Keyes is in a
21 wheelchair, and I want to give you the background on
22 that.  And I think it's an important one in this case
23 because the care that he is receiving right now is
24 not sufficient.
25          He's been detained at the GEO facility

Page 10

1  and he hasn't been receiving his pain meds, he hasn't
2  been receiving an inhaler, which he needs because he
3  had a collapsed lung as a result of the accident that
4  put him in the wheelchair.  He -- he has bed sores.
5  I'll get into that in a moment.  But I think it's
6  important because the court has to consider
7  Mr. Keyes's physical condition as a part of its
8  release determination.
9           Mr. Keyes is a paraplegic, what's
10 called -- what's termed as a T7 paraplegic, as a
11 result of a car accident in 2006.  He was in the
12 hospital -- he was ejected from a car and severed his
13 spine and other -- other bones and nerves and things
14 of that sort in his back.  He was in the hospital for
15 several months.  He was in a coma for two months.  He
16 had to relearn how to speak, things of that sort.
17 But most significantly, he severed his spine and he
18 is a paraplegic -- what's called a T7 paraplegic.
19          As a result of that accident, he
20 obviously needs daily care.  He also has recently
21 under -- he's -- Mercer, is what I'm trying to get
22 at.  This disease, it's kind of like a skin disease
23 that he has -- he has been suffering with, has
24 hypersensitive skin as a result of that.  In order to
25 prevent the Mercer from coming back or getting worse,

Page 11

1  he has to do pressure releases every 10 to 15
2  minutes, which he's not able to do while he's in
3  custody.
4           He has long-term -- long-term or
5  long-time UTIs, urinary tract infections, so he has
6  to use a catheter, which he has to get changed daily.
7  He's in constant pain.  He's especially in pain when
8  he's not receiving his pain medication, which he
9  hasn't been.
10          As a result of him being a paraplegic
11 and the Mercer, especially, those two combinations --
12 in combination with each other, he gets bed sores.
13 He needs to be rotated every two hours, and that has
14 not been happening at the GEO facility.
15          Essentially, the daily care -- his
16 caretaker is here.  Her name is Kulani Stanton.  And
17 I've spoken with her and she has offered that if he
18 is released on bond that she can reside with him.
19 His -- his father is also here and he supports him.
20          In the bail report it mentions that his
21 mother is an option for custody, which I think it
22 could be, but it's a distant second option because
23 she does live on the second floor of an apartment
24 building.  But if the court is more inclined to
25 release him to the mother, then that's fine as well.

Page 12

1           I mean, ultimately, at the end of the
2  day, he would like to be released to have his medical
3  care addressed.  In speaking with Kulani, the medical
4  care that -- that he needs daily -- she gets him up,
5  she transfers him to the toilet, because he obviously
6  can't move himself.  He has constipation problems,
7  and he -- basically, his -- his anal area needs to be
8  prepared in order to stimulate him going to the
9  bathroom.  He hasn't had a bowel movement since he's
10 been in custody for the last six days.  They gave him
11 a suppository last night and it still hasn't -- it
12 hasn't worked.  He still hasn't had a BM since -- for
13 six days.
14          But Ms. Stanton prepares the area -- I
15 guess is a way of saying it -- Vaseline and things of
16 that sort to help him move his bowels.  That hasn't
17 been happening.  She transfers him to the bathtub,
18 she then prepares his food.  She moves him, as I was
19 saying, every two hours.  She dresses him.
20          In addition to her, there's a wound
21 nurse who comes to Mr. Keyes's -- who comes to
22 Mr. Keyes's location every other day.  That is
23 because he has open sores on his behind, which also
24 complicates him using the restroom, and the bed
25 sores.  He goes to therapy two to three times a week,

Case 1:18-cv-01469-JLK   Document 47-1   Filed 11/16/18   USDC Colorado   Page 6 of 10

United States of America vs.
Ronnie Nathaniel Keyes

Audio Recorded Arraignment/Detention/Discovery Hearing
June 29, 2016

Page 13

1  and he also gets skin massages.
2          That is -- that is the -- from what I
3  could have gleaned in the two hours since I have met
4  Mr. Keyes and talking with his caretaker and his
5  father, that is the extent of what I can -- that I
6  have at my fingertips right now.
7          There are probably more, and there are
8  probably things that I am missing, but that is the
9  care that Mr. Keyes has required.  And I don't think
10 it's a criticism of GEO to say that they haven't been
11 doing these things, because I just don't think they
12 have the capacity to do these things.  And I'm not
13 sure that any facility has the capacity to do them.
14         As I said, he has been getting some of
15 his meds.  He's on a whole list of meds, many of
16 which -- he doesn't know all of them, but he's on
17 meds for blood clot and blood thinner, for his
18 long-term UTI, the catheter, as I mentioned earlier.
19 He's on two different types of painkillers -- at
20 least -- his inhaler, and he has another medication
21 for muscle spasms.  He hasn't been receiving his
22 inhaler, his pain meds.  Just yesterday for the first
23 time, he got a suppository.  He has been receiving
24 three meds that he knows of, but he certainly is --
25 that is not anywhere near the care that he needs to

Page 14

1  have.
2          So I ask this court to consider
3  Mr. Keyes's physical condition in assessing whether
4  he's a risk to the community or a flight risk.  I do
5  not think he is a flight risk.  He has -- let's talk
6  about his ties to the community.
7          He has extensive ties to the community.
8  He actually moved here in 2009, in order to come here
9  to try to get into Craig's -- Craig's Rehabilitation
10 Institute.  I guess it's a world-renowned, very
11 well-known, top rehab -- rehabilitation place.  He
12 moved here to try to get into that program.  At first
13 he was not able to get into it.  He was put on a wait
14 list, and two months ago is when he recently just got
15 accepted -- or a few months ago, the exact timing is
16 a little bit uncertain.
17         But he has, now, recently been accepted
18 into the Craig's Rehabilitation Institute, which,
19 number one, is an incentive for him -- he moved here
20 in 2009.  His accident was in 2006, he moved here in
21 2009 to try to get into that rehabilitation facility,
22 and he just recently got accepted.  That is incentive
23 for him right there to not leave the Denver area
24 because he wants to continue with that program which
25 took him so long to get into.

Page 15

1          All of his medical care is here.  He is
2  well established.  His medication, his care, the
3  nurses, things of that sort, they are all in the
4  Denver local area.  Several of his family members are
5  in the Denver area, including his four brothers.  And
6  he has -- he also has two sisters, but they are not
7  in the Denver area.  He has one son who is in the
8  Denver area.  His ties to the community are numerous,
9  though, in addition to his family, what he does --
10 what he does in the community.
11         Now, the government paints this picture
12 of Mr. Keyes as being threatening and things of that
13 sort, but that's not the complete picture.  In fact,
14 he denies the threats.
15         Mr. Keyes has started a nonprofit group
16 called the Montbello Guardian Angels in late 2009
17 with his -- it's his wife and him that know a lot
18 about it.  He was very active in giving charity to a
19 school called Rachel B. Noel School, which was his
20 children's school.  People know him there.  He -- he
21 does raffles for the school, like -- things like
22 raffling off pairs of shoes in order to earn money
23 for the school.
24         Around his neighborhood, everybody
25 knows him.  He participates in neighborhood

Page 16

1  barbecues.  He purchased basketball rims and
2  projector screens and things like that for the
3  school.  He passed -- around holidays he passes out
4  bags of candy for kids around the area.
5          He's -- he's active in the local
6  child -- children's sports community.  He's an
7  assistant coach -- or he had been an assistant coach
8  for the football team, called the Falcons, in the
9  Montbello area.  He was an assistant coach at
10 Montbello Rec basketball teams.
11         He has -- the business areas in the
12 community around there know Mr. Keyes, and things of
13 that sort.  His ties to the community are extensive.
14         He's -- he's not a flight risk.  I say,
15 look at him.  The government says that he was
16 resisting arrest.  Well, he's in a wheelchair.  I
17 mean, there's not much that he can do.  His hands
18 were on the steering wheel.  From what I understand,
19 he was --
20         THE COURT:  Is this a specially
21 equipped vehicle?
22         MR. JOHNSON:  What's that?
23         THE COURT:  Is this a specially
24 equipped vehicle?
25         MR. JOHNSON:  No.  He wasn't driving.

Case 1:18-cv-01469-JLK   Document 47-1   Filed 11/16/18   USDC Colorado   Page 7 of 10

| United States of America vs. Ronnie Nathaniel Keyes | Audio Recorded Arraignment/Detention/Discovery Hearing June 29, 2016 |

Page 17

1  THE COURT: Does he drive?
2  MR. JOHNSON: No. And all the -- I'm
3  always at a disadvantage. And this is one of the
4  cases, in particular, that I'm at a disadvantage in
5  answering a lot of those questions because I haven't
6  received discovery. I'm not going to until July 1st,
7  but -- and so I know very little about the facts and
8  I -- and I think that's true in all detention
9  hearings. Or most of them. But from what I
10 understand, there are some unusual circumstances
11 about him being in the car in the driver seat for a
12 video type thing, and circumstances around that. So
13 he wasn't driving, and it wasn't even his car.
14      And what was Your Honor's question
15 before that?
16      THE COURT: It was regarding whether he
17 drives.
18      MR. JOHNSON: Okay. So, Your Honor,
19 his ties to the community are extensive, his medical
20 condition is extensive, so I don't believe that he's
21 a danger to the community. I don't believe he's a
22 flight risk.
23      He denies -- this whole -- this whole
24 conversation that was talking about this -- of what
25 I've heard for the first time while I was sitting

Page 18

1  here, about this whole DV situation, which he denies,
2  and no charges have been brought and no charges will
3  be brought. And it just did not happen, this whole
4  allegations of DV.
5      One of the things that the government
6  mentioned is that he has a -- I think that it was a
7  quote -- lengthy history of FTAs, failures to appear
8  and failures to comply, and I just disagree. In
9  fact, what I see from -- so he certainly does have a
10 lot of prior convictions. I'm not going to say any
11 -- I'm not going to try to contend otherwise, because
12 it's -- they're there. But most of them are old.
13 And with somebody who has four misdemeanor
14 convictions and six felony convictions, I see that a
15 lot -- and I'm sure Your Honor sees it a lot -- we
16 usually, when we see that, get nine, ten failures to
17 appear.
18      What I see, according to the bail
19 report, is that he failed to comply on two occasions.
20 That's what the bail report says. And when -- I'm
21 looking at what he failed to comply. There was one
22 failure to comply in 2011. I don't even see the
23 other one. That was 2011, so that was five years
24 ago. Then there was a failure to appear in 2012, and
25 then the warrant was canceled. And the reason why it

Page 19

1  was canceled was because he was in the hospital. So
2  he absolutely does not have a long history of
3  failures to appear or failures to comply.
4      Especially, given with -- on the other
5  side of the equation, of course, is more convictions.
6  But you've got to look at the other thing. When he
7  has these convictions, he appears in courts and he
8  complies. So I don't think that he is a flight risk.
9      THE COURT: Mr. Johnson I think needs
10 them.
11      MR. JOHNSON: Oh. Thank you, Your
12 Honor. I am a little hoarse and my nose is a little
13 runny.
14      THE COURT: That's taken
15 (indiscernible).
16      MR. JOHNSON: Thank you.
17      THE COURT: I don't -- sniffling is a
18 distraction for all of us, especially for you, so....
19      MR. JOHNSON: And then when you look at
20 the -- so I think I've addressed most of the
21 arguments that the government has made.
22      When you look at the pretrial services
23 report, as far as why he's a risk of nonappearance,
24 they list things such as his diagnosis -- his mental
25 health diagnosis, but that -- and that was when he

Page 20

1  was an adolescent.
2      THE COURT: I -- I -- let's skip the --
3      MR. JOHNSON: Yeah. I don't know
4  what --
5      THE COURT: -- the nonappearance.
6  Maybe he -- maybe he isn't, but that's not the part
7  of his background that leaps out at you when you read
8  this. I appreciate the statements about working with
9  youth, but the very first rule of working with youth
10 is providing a role model. Not providing them
11 things, but providing them a standard by which to
12 live. How is the record that he's had since 2009
13 consistent with being a role model for youth? That's
14 what I want to know.
15      MR. JOHNSON: Since 2009, he had his --
16 he had an attempted second degree assault prior
17 conviction, and then the second degree assault
18 drugging a victim. In relation to that second -- the
19 2011, on the second -- the bottom half of page 8, the
20 facts of that case are important, and I think they're
21 reflected in the sentence that he received, which was
22 probation.
23      The pretrial services report doesn't
24 mention that he has had suicidal ideations in the
25 past. And that's exactly what the second half of

Case 1:18-cv-01469-JLK   Document 47-1   Filed 11/16/18   USDC Colorado   Page 8 of 10

| United States of America vs.<br>Ronnie Nathaniel Keyes | Audio Recorded Arraignment/Detention/Discovery Hearing<br>June 29, 2016 |

**Page 21**

1. page 8 stems from, is that he was -- he was
2. contemplating suicide and somebody slapped the gun
3. away and the gun went off.  And that's what's
4. resulting in that prior conviction on the bottom of
5. page 8.  I don't know the facts about the top of
6. page 8.
7.     THE COURT:  Well, what's -- what's the
8. drugging have to --
9.     MR. JOHNSON:  I think the -- and I
10. don't know this, but from what I understand -- I see,
11. often, drugging as a pled -- it gets pled to
12. drugging.
13.     THE COURT:  Oh.
14.     MR. JOHNSON:  Lower degree felony,
15. rather than --
16.     THE COURT:  Okay.
17.     MR. JOHNSON:  -- first degree assault.
18. So when I think that you consider the risk of
19. nonappearance, there is no risk of nonappearance.  He
20. can live with his caretaker.  Electronic monitoring
21. is something that he is more than happy to comply
22. with.  A telephone -- a landline can be set up in the
23. house.  A custodian could be appointed if the court
24. believes it is appropriate.  An unsecured bond, of
25. course, which is typical, he's happy to comply with

**Page 22**

1. any and all conditions.
2.     The one probation revocation that he
3. had in 2013 -- and that goes, also, to another point
4. made in the pretrial services report -- is marijuana
5. usage.  He -- he was -- he was using medical
6. marijuana which, obviously, is not allowed in the
7. federal system.  It is illegal in the federal system,
8. but that was his probation violation.  And then they
9. revoked him and terminated him because they said,
10. Well, he has the medical marijuana card and so he's
11. going to be using the marijuana.  And that was in
12. relation -- so that is what the facts were of the
13. probation violation.
14.     He understands, obviously, that if he
15. is granted bond in this case, he cannot use marijuana
16. while he is --
17.     THE COURT:  Does he have an
18. addiction --
19.     MR. JOHNSON:  -- under supervision.
20.     THE COURT:  -- to any substance that
21. you are --
22.     MR. JOHNSON:  Not that I am aware of.
23.     THE COURT:  Okay.  So the program
24. you're talking about at Craig, what kind of a program
25. is that?

**Page 23**

1.     MR. JOHNSON:  It's a -- it's a
2. rehabilitation institute.
3.     THE COURT:  Physical rehabilitation,
4. are you talking about?
5.     MR. JOHNSON:  Spine.  I guess they
6. specialize in the spine.
7.     THE COURT:  Yeah.  That's Craig
8. Hospital.  That's -- yeah, of course.
9.     MR. JOHNSON:  Right.  Exactly.  That --
10. that -- apparently it's well-known.
11.     THE COURT:  Of course it's
12. (indiscernible).
13.     MR. JOHNSON:  I -- I hadn't heard of
14. it, so I'm out of it, I guess.
15.     THE COURT:  That's where Amy Van Dyken
16. went when she severed her spine when she had her
17. accident.  Wasn't it --
18.     MR. JOHNSON:  He -- I guess his spine
19. is deteriorating.  He also has deteriorating bones
20. in --
21.     THE COURT:  Yeah.  No, it's -- it's
22. maybe the best program in the world, I imagine.
23.     MR. JOHNSON:  There you go.
24.     THE COURT:  But he -- you've got to
25. want it more than this other stuff.  If you want to

**Page 24**

1. get better, if you don't want to get bed sores, if
2. you do want to get treatment --
3.     MR. JOHNSON:  And all of these other
4. things are allegations right now.  And there are a
5. lot of extenuating circumstances that I can't go into
6. or -- and I can't right now because they need to be
7. investigated and things of that sort.  But -- and so
8. what's important is that all of these things are just
9. allegations right now, and this is not a presumption
10. case.
11.     THE COURT:  Yeah, but you -- you
12. said -- okay.  So I'm to consider statutory factors.
13. One factor is physical health, which you've brought
14. up in detail.  But another factor is the nature and
15. circumstances of the offense charged.  I'm not only
16. allowed, I'm required to consider that as well.  So I
17. have to consider that.  And we've had a proffer that
18. sounds fairly strong.  And, in fact, taken in
19. conjunction with the statements of law enforcement
20. that he would cause them harm, then that's -- that's
21. just something I have to consider.  Don't you agree?
22.     MR. JOHNSON:  I think you have to
23. consider it.  And -- and as I said earlier, I'm at a
24. disadvantage to be able to address that.  May I have
25. a moment?

Case 1:18-cv-01469-JLK   Document 47-1   Filed 11/16/18   USDC Colorado   Page 9 of 10

United States of America vs.
Ronnie Nathaniel Keyes

Audio Recorded Arraignment/Detention/Discovery Hearing
June 29, 2016

Page 25

1    Your Honor, in relation to those
2 statements to the police, he denies that and he says
3 that it was misunderstood exactly what he was saying.
4 He wants to stress that he is a role model to the
5 youth in his community and the things that he has
6 been doing, especially because he was a gang member.
7 And that's reflected in the gang report.
8    He left the gang life 12 years ago.
9 He -- he -- he got out of the gang while he was in
10 prison, and that's where his extensive record comes
11 from, the felonies and the misdemeanors.  Most of
12 that comes from when he was in the gang life.  He
13 left that 12 years ago, and since that time he has
14 done everything that he can to be a positive role
15 model for the youth in the community.  And that is
16 what is important to him.
17    Now, there are a lot of extenuating
18 circumstances to this case and things that need to be
19 looked into, but of course -- to answer your
20 question, of course you have to look at that.  You
21 have to consider the government's proffer as much as
22 you have to consider my proffer.  And in this case
23 where there is no presumption, I think it weighs in
24 favor of releasing Mr. Keyes.
25    THE COURT:  Thank you.

Page 26

1    MR. WINSTEAD:  Your Honor, I know I
2 took my fingers off the chess piece.  I do have a
3 couple clarifications if the court wishes.
4 Otherwise --
5    THE COURT:  No.  What do you mean you
6 took your fingers off the chess piece?
7    MR. WINSTEAD:  I finished my proffer
8 earlier.  I just --
9    THE COURT:  Oh, no.  I mean, you get --
10 the burden is on you since it's not a presumption, so
11 whatever you want to say.
12    MR. WINSTEAD:  Okay.  Thank you, Your
13 Honor.
14    THE COURT:  (Indiscernible.)
15    MR. WINSTEAD:  In response to the
16 comments just now about the defendant's gang
17 membership, just of note is that during the
18 defendant's encounters with police in this case, he
19 did make statements to them related to his gang
20 membership implying that it's not something that's
21 necessarily in the past or at least that he's
22 completely left that life behind.
23    With regard to the 2011 conviction for
24 the second degree assault by drugging, in that case
25 the defendant shot his at-the-time girlfriend or

Page 27

1 wife, and she did not wish to cooperate in the
2 prosecution.  And so you can see the charge of first
3 degree assault, serious bodily injury with a deadly
4 weapon was dismissed and the defendant pled to a
5 lower charge on that one.
6    Additionally, Your Honor, I forgot to
7 mention this before, but there was a pistol -- in
8 addition to the AR magazines, there was a pistol
9 magazine that had several rounds in it found in the
10 car, but no pistol, suggesting that that pistol is
11 somewhere.
12    And then, finally, the individual who
13 was the recipient of the threats on the night in
14 question, it was, in fact, the defendant's caretaker
15 or girlfriend, Ms. Stanton.  So just to clarify that.
16    THE COURT:  His caretaker is also his
17 girlfriend?  Is that what you're saying?
18    MR. WINSTEAD:  According to the
19 materials that I have, yes, Your Honor.
20    THE COURT:  Okay.  Now, again, was he
21 sitting -- he was sitting in the driver's seat of a
22 car?
23    MR. WINSTEAD:  Yes, Your Honor.
24    THE COURT:  Which he was incapable of
25 operating?

Page 28

1    MR. WINSTEAD:  Apparently, so, Your
2 Honor.
3    THE COURT:  And the weapon was where?
4    MR. WINSTEAD:  It was on the near
5 passenger floorboard, leaned up against the side of
6 the door well.
7    THE COURT:  Okay.  On the other side of
8 the console of the car, right?
9    MR. WINSTEAD:  Yes.  From what I
10 understand, Your Honor, it was angled in a way that
11 it would be easy to lean down and -- and grab by the
12 pistol grip.
13    THE COURT:  Okay.  But he didn't drive
14 that car there and he wasn't going to be driving it
15 away.
16    MR. WINSTEAD:  Your Honor, I, frankly,
17 don't have an explanation for why he was sitting in
18 the car at that time.  That's just where he was when
19 police encountered him.
20    THE COURT:  Okay.  Is there any --
21 describe the -- the condition of some kind of
22 treatment facility or halfway house in terms of it
23 not being sufficient to address threat to the
24 community.
25    MR. WINSTEAD:  Well, Your Honor, as far

Case 1:18-cv-01469-JLK   Document 47-1   Filed 11/16/18   USDC Colorado   Page 10 of 10

| United States of America vs. Ronnie Nathaniel Keyes | Audio Recorded Arraignment/Detention/Discovery Hearing June 29, 2016 |

Page 29

1  as a halfway house, to the extent that it allows the
2  defendant to leave and go about his business, his
3  presence in the community presents the danger any --
4  any defendant's presence in the community allows.  I
5  really am not aware of -- I mean, I suppose the
6  arguments are, the defendant's history shows that he
7  presents a risk of danger to the community.  The
8  particular person that he has requested to be placed
9  with has been the victim of -- of violence and
10  threats from him in the past, and there is a pistol
11  out there somewhere, presumably --
12         THE COURT:  What -- what type of a
13  round was in it?
14         MR. WINSTEAD:  That was a 40 caliber.
15  I believe it went with a Hi-Point 40 caliber Smith &
16  Wesson.
17         THE COURT:  Okay.  All right.  Well,
18  I'm going to sit on this one for a while, okay, and
19  I'll issue an order this afternoon.  I just need to
20  spend more time looking at the record.  Okay?
21         MR. WINSTEAD:  Thank you, Your Honor.
22         MR. JOHNSON:  Thank you, Your Honor.
23         THE COURT:  And so until then,
24  Mr. Keyes is remanded to the custody of the US
25  Marshal.  Anything further?

Page 30

1         MR. WINSTEAD:  Nothing further from the
2  United States, Your Honor.
3         THE COURT:  Okay.  Then we'll be in
4  recess.
5         THE COURTROOM DEPUTY:  All rise.  Court
6  is in recess.
7         (Whereupon, the within hearing was then
8  in conclusion at 11:08 a.m.)
9         I certify that the foregoing is a
10  correct transcript to the best of my ability to hear
11  and understand the audio recording and based on the
12  quality of the audio recording from the
13  above-entitled matter.
14
15
16
17  /s/ Kelly Mair          April 28, 2016
18  Signature of Transcriber     Date
19
20
21
22
23
24
25